IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 18, 2018 Session

## JOHN R. JACKSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County**
No. 41100157    William R. Goodman, III, Judge

_____

**No. M2017-00787-CCA-R3-PC**

_____

A Montgomery County jury convicted the Petitioner, John R. Jackson, of two counts of facilitation of aggravated robbery, one count of aggravated burglary, one count of facilitation of theft of property valued over $500, and one count of aggravated sexual battery. The trial court imposed a total effective sentence of twenty years in the Tennessee Department of Correction. On appeal, this court affirmed the judgments and sentence. *See State v. John R. Jackson*, No. M2013-00696-CCA-R3-CD, 2014 WL 2039761 (Tenn. Crim. App., at Nashville, May 16, 2014), *perm. app. denied* (Tenn. Sept. 22, 2014). The Petitioner filed a post-conviction petition, and the post-conviction court denied relief following a hearing. On appeal, the Petitioner maintains that he received the ineffective assistance of counsel, his convictions are based on illegal evidence presented at trial, and the State committed prosecutorial misconduct during opening and closing statements. After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Taylor R. Dahl, Clarksville, Tennessee, for the appellant, John R. Jackson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; John W. Carney, Jr., District Attorney General; and J. Lee Willoughby, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Montgomery County jury convicted the Petitioner of two counts of facilitation of aggravated robbery, one count of aggravated burglary, one count of facilitation of theft

of property over $500, and one count of aggravated sexual battery. On direct appeal, this court summarized the evidence presented at the Petitioner's August 2012 trial as follows:

[K.M.][1] testified that she was living in Shannon Woods Apartments in Clarksville, Tennessee, on September 27, 2010. Xavier Brown was her roommate. On the day in question, she left work at 3:00 a.m. and went home. She and Brown watched a movie. At about 6:00 a.m., they began watching a second movie. At approximately 6:15 a.m., [K.M.] heard the door handle jiggle. When she looked up, she saw that the door was open, and three men were standing there. Two of the men were armed and masked. The third man was not masked.

The three men entered the apartment without consent. They began screaming and pointing their guns at [K.M.] and Brown, telling them to get up. The men were yelling about drugs. According to [K.M.], one of the masked men went into her bedroom and bathroom and began "searching and ransacking." The unmasked man was looking through the cabinets and closet in the living room, and the other masked man was talking to [K.M.]. The men made Brown get on his knees, and they made both Brown and [K.M.] close their eyes. The men also made both victims strip to their underwear. One of the men held a gun to the back of Brown's head. Another assailant said, "Don't shoot that guy."

The masked man that was speaking to [K.M.] asked her about her fiancé. She testified that, "at first," this person was "kind of just trying to be nice." Then, he told her to take off the rest of her clothes. When she had done so, he told her "that if this was a different situation or under different circumstances, he would try to talk to [her], that he liked [her] tattoos." [K.M.] testified that the man "rubbed his gun on" her tattoos and then he "smacked [her] butt." [K.M.] clarified that he rubbed his gun across her chest. She added that these actions made her feel as if she had been raped.

When the second masked man returned from the back of the apartment, he asked the others what they were doing. [K.M.] asked him if she could put her clothes back on, and he said yes. As the men were leaving the apartment, they took [K.M.]'s phone apart and "threw it all in different places," warning her not to call the police. One of the men then noticed [K.M.]'s engagement ring. He asked her to take it off, which she

---

[1]It is the policy of this court to refer to victims of sexual crimes by their initials.

did, and she began to cry. He put the ring back on her finger and said, "I wouldn't do that to you." One of the other men then came up, put a gun to her head, and took her ring, saying, "I'll do that to you." The men also took an X–Box, a PlayStation, her laptop computer, CDs, and DVDs.

After the men left, [K.M.] went to her father's house. Her sister called the police.

Some weeks later, [K.M.] was doing her laundry at the apartment complex's facilities. The [Petitioner] approached her and began talking to her. He asked if her fiancé was home. She became uncomfortable because she did not recall having any previous conversation with him. On another occasion, a friend of hers was at her apartment and asked if one of his friends could join them. She said yes, and the [Petitioner] came over. She remembered him from the laundry facilities. They had a conversation, and she recounted the robbery. The [Petitioner] began explaining that his brother, Demetrius, had been involved in the robbery. At the same time, the [Petitioner] was blaming the robbery on "Flint." The [Petitioner] did not implicate himself in the robbery. During this same conversation at [K.M.]'s apartment, the [Petitioner] asked to see her phone. When she expressed reluctance, he asked if she was afraid that he was going to look at her pictures. When she answered affirmatively, the [Petitioner] said, "I wouldn't do that to you." She testified that she then thought, "[T]hat sounds familiar."

On cross-examination, [K.M.] stated that, at one point, the unmasked man put a gun in her face, but she did not know if it was a third gun or if he had gotten the gun from one of the masked men. She also stated that the men indicated that they were there because of Brown and that they were not there for her. She explained that Brown had been her roommate for two to three weeks at that point.

[K.M.] acknowledged that she misidentified three suspects from photographic arrays about one week after the assault. She acknowledged that she never identified the [Petitioner] from a photographic array. She stated that it was about two months after the attack that she saw the [Petitioner] in the laundry facilities and that she "most definitely didn't recognize him." She acknowledged that she did not know which man took her property, but she saw them leaving with a duffle bag. She clarified that one of her tattoos was on her breast, and the other one was on her hip. She also said, "The nice guy had dreadlocks at the time."

On re-direct examination, [K.M.] acknowledged that she initially was dishonest with the police about Brown's presence at her apartment because he told her that he was in trouble. She kicked him out of the apartment "[r]ight after it all happened." She clarified that the [Petitioner] was not pictured in the three photographic arrays in which she circled other suspects. She also clarified that she never identified with certainty any of the people she circled. On a fourth photographic array, she identified co-defendant Dimetrius Ford with a notation that she was "80% sure."

Xavier Brown testified that he stayed with [K.M.] at her apartment for three or four months. He was planning on moving to Alaska and intended to finance his move through selling marijuana. To this end, he had asked some people around the apartment complex about where he could purchase the marijuana.

At about 6:00 a.m. on September 27, 2010, he was watching a movie with [K.M.]. They were both sitting on the couch. He heard the doorknob jiggle, and then the door flew open and three men entered the apartment. Two of the men were masked. The third man "grabbed his shirt and was covering his mouth with it." One of the masked men had dreadlocks, and he had a gun. One of the other men also had a gun. The man with the dreadlocks put his gun to Brown's head and asked, "Where's the green at? Where's the money?" Brown understood "green" to be a reference to marijuana. The man made him and [K.M.] get up and empty their pockets and take off their outer clothing. Brown took his wallet and phone out of his pockets, and these items were taken.

Brown told the men that he did not know what they were talking about, and they started going through the apartment. One of the men kept him and [K.M.] under surveillance, one of the men went to the back of the apartment, and the third man was in the kitchen. Brown was turned into a corner, limiting his ability to see what was happening. He did not know if the man in the kitchen was masked or not. Later, the man with the dreadlocks put Brown on the floor, pulled Brown's hoodie over him, and hit him in the back of the head with the butt of his gun. Brown heard the other two men tell the man with the dreadlocks not to shoot Brown.

Brown later identified a photograph of the [Petitioner] as the man with the dreadlocks.

- 4 -

On cross-examination, Brown admitted that he misidentified another suspect from another photographic array. He also admitted that he was untruthful in his written statement to the police. He admitted to previous charges of assault and aggravated burglary. He admitted that he currently was on probation. He acknowledged that he knew that selling half of a pound of marijuana was a felony. He stated that the men made him and [K.M.] disrobe in order to make sure they were unarmed.

Co-defendant Marquan Hudson testified that he participated in the instant crimes with the [Petitioner] and Ford. He stated that the robbery was the [Petitioner]'s and Ford's idea and that those two men had handguns, but he did not. Ford drove them in Hudson's girlfriend's truck. The [Petitioner] and Ford covered their faces but Hudson did not. He heard the other two men talking about getting "some weed." He did not know their destination, however.

When they got to the apartment at Shannon Woods, all three men got out of the truck. Hudson tried to cover his face by pulling his shirt up. They walked up to the apartment and found the door unlocked, so they went inside. They saw a man and a woman in the apartment. Hudson gathered some DVDs, video games, and CDs and put them in a bag. He stated that, initially, he went into the back of the apartment with Ford but then returned to the living room when he heard some commotion. He saw that Brown was wearing nothing but his underwear and [K.M.] was naked. The [Petitioner] was with them. He stated that he "tr[ied] to stop [the Petitioner] from doing all the extra curricular activities." He told the [Petitioner] not to shoot Brown. The [Petitioner] walked over to [K.M.] and rubbed his gun on her breasts and "butt." The [Petitioner] was laughing. When Ford returned to the front of the apartment, Ford told the victims to put their clothes back on. Ford noticed [K.M.]'s engagement ring. Initially, Ford took the ring but then gave it back to [K.M.]. Hudson "ended up taking the ring."

Hudson stated that they left the apartment with the bag containing the items that he gathered. They returned to Ford's house. Hudson stated that he did not get any of the property that they took, but he acknowledged using a cell phone that they got from the apartment. He pleaded guilty to two counts of robbery in this case, and he agreed to testify against the [Petitioner] as part of his plea agreement.

- 5 -

On cross-examination, Hudson reiterated that there were only two guns used during the offenses.

Angelica Espinoza testified that she was dating Hudson in September 2010. On the night of September 26, 2010, she drove herself to a party at an apartment complex on Airport Road. At the party were Hudson, Ford, and several other people. The [Petitioner] arrived after she did. She went to bed there at about 2:30 a.m. and awoke at about 6:30 or 7:00 a.m. She and another woman were the only people still in the apartment. Hudson had taken her vehicle at about the same time she went to bed, telling her that Ford was going with him. After she woke up, she saw her vehicle pull up. Ford was driving it, and with him were Hudson and the [Petitioner].

Detective Eric Ewing of the Clarksville Police Department testified that he was the lead investigator on this matter. After he developed the [Petitioner] as a suspect, he interviewed the [Petitioner]. After being advised of his rights, the [Petitioner] agreed to give a statement. Initially, the [Petitioner] told Det. Ewing that Conway Lowder, nicknamed "Twenty Two," told him about having committed the crimes at [K.M.]'s apartment with Ford and Hudson, nicknamed "Flint." Because of the amount of detail that the [Petitioner] related to Det. Ewing about the crimes, Det. Ewing told the [Petitioner] that he did not believe that the [Petitioner]'s knowledge was second-hand.

The [Petitioner] then admitted to having been with Ford and Hudson during the crimes. The [Petitioner] gave two written statements that were admitted into evidence. In these written statements, the [Petitioner] claimed that the attack was Hudson's idea and that, when Hudson talked Ford into participating, the [Petitioner] went along to protect Ford, the [Petitioner]'s "little brother." When the three men entered the apartment, the [Petitioner] went to the back and searched the bedroom closet. He heard Hudson telling the victims to strip. When the [Petitioner] returned to the living room, Ford went into the bedroom. As the [Petitioner] was searching the kitchen, he heard Hudson say, "get naked." When the [Petitioner] looked, he saw "the girl is naked." Ford returned and told Manor to put her clothes on, and the [Petitioner] returned to the bedroom. The [Petitioner] denied seeing anyone touch Manor in a "sexual manner," explaining that he "was facing the kitchen area when [Hudson] made her strip." The [Petitioner] also stated that he was unarmed during the attack and that the only thing he took were some DVDs.

- 6 -

Det. Ewing stated that he recovered [K.M.]'s engagement ring from Ford's attorney. The remainder of the stolen property was not recovered.

On cross-examination, Det. Ewing acknowledged that there was no physical evidence connecting the [Petitioner] to these crimes. He acknowledged that, initially, both victims provided some false information. Also, when he first spoke with Hudson, Hudson denied being involved. After Hudson was arrested, Hudson claimed to have been pressured into participating.

The State rested its case-in-chief after Det. Ewing's testimony and dismissed the second charge of aggravated sexual battery. The [Petitioner] waived his right to testify, and the defense presented no witnesses.

Based upon this proof, the jury found the [Petitioner] guilty of two counts of facilitation of aggravated robbery, one count of aggravated burglary, one count of facilitation of theft over $500, and one count of aggravated sexual battery. On September 28, 2012, the [Petitioner] filed a motion for judgment of acquittal on his aggravated sexual battery conviction. On October 5, 2012, the trial court conducted a sentencing hearing and denied the [Petitioner]'s motion for judgment of acquittal. The trial court sentenced the [Petitioner] as a Range III persistent offender to fifteen years for each of the facilitation of aggravated robbery offenses, to fifteen years for the aggravated burglary, to eleven months and twenty-nine days for the facilitation of theft, and to twenty years for the aggravated sexual battery. The trial court ordered these sentences to be served in prison, concurrently to each other but consecutively to previous sentences. The judgment orders were entered and filed on October 5, 2012. The Defendant filed a notice of appeal on November 5, 2012. The Defendant filed a motion for new trial on November 14, 2012. The trial court held a hearing on the [Petitioner]'s motion for new trial on March 28, 2013, and subsequently denied it.

*Jackson*, 2014 WL 2039761 at *1-5.

The Petitioner filed a post-conviction petition raising numerous issues, including ineffective assistance of counsel, use of illegal evidence, and prosecutorial misconduct. At the hearing on the petition, the parties presented the following evidence: The Petitioner testified that his trial attorney ("Counsel") failed to cross-examine the State's witness, K.M., on prior inconsistent statements. He stated that K.M.'s statements to the

police did not include a description of any of the suspects' hair. The reports indicate that she told the police that the intruders' faces were covered so all she could see were the suspects' eyes. Additionally, K.M. testified consistently at a November 10, 2011 Community Corrections violation hearing. At trial, however, K.M. testified that one suspect wore his hair in dreadlocks. The Petitioner recalled that he told Counsel to question K.M. about her prior statements that did not include the detail about dreadlocks and that Counsel "said he wouldn't do it." The Petitioner identified K.M.'s statement to the police dated September 27, 2010. The statement is included in the record and makes no mention of dreadlocks.

The Petitioner testified that another State witness, Xavier Brown, spoke with police following the home invasion making no mention of dreadlocks. At the Community Corrections violation hearing, however, Mr. Brown testified that one of the suspects wore his hair in dreadlocks. The Petitioner identified Mr. Brown's September 30, 2010 statement to police recounting the events of the home invasion. In the statement, Mr. Brown did not describe the suspects' appearances other than to say they were armed. The Petitioner confirmed that Counsel did not cross-examine Mr. Brown at trial about the lack of description in his initial statement to the police. The Petitioner recalled that he specifically requested in several letters to Counsel and at trial that Counsel introduce the police statements. The Petitioner stated that Counsel "didn't impeach the victims at all, whatsoever."

The Petitioner testified that, at the Community Correction violation hearing, K.M. "came up first and she stated that all she seen was eyes, she couldn't see nothing else, and their head was covered, neck was covered." The Petitioner confirmed that he asked Counsel the Thursday before his trial began to introduce the violation hearing testimony. He reiterated that Counsel did not raise the discrepancies between K.M.'s prior statement and her testimony at trial.

The Petitioner testified that Counsel was deficient for failing to seek the trial court's determination of the admissibility of his prior convictions at trial. According to the Petitioner, before trial, Counsel never discussed the use of the Petitioner's prior convictions at trial with him. The Petitioner recalled that Counsel did not object when the trial court asked about the State cross-examining the Petitioner on his prior convictions. As it related to his decision not to testify, the Petitioner said the option was never discussed; Counsel simply told him he would not be testifying at trial. The Petitioner stated that he wanted to testify at trial but that he deferred to Counsel's judgment. He explained, "I mean, he was my lawyer so, as I said, I felt like he knew best in that particular aspect of this."

The Petitioner testified that "[a]t the time of trial" he told Counsel he wanted to accept the State's offer to plead guilty but that Counsel said that the State's offer was "off the table." The Petitioner explained that the State's notice of intent to seek enhanced punishment referenced Tennessee Code Annotated section 40-35-106, which provides for Range II, multiple offenders. Further, at a settlement date, the trial court had stated that the Petitioner was a Range II, multiple offender. On the morning of the trial, however, the trial court reviewed the notice and stated, "we're going to make him a range three." It was at this point that the Petitioner decided that he wanted to accept the State's offer. The Petitioner said that he also asked Counsel to seek a continuance but that Counsel responded that "I don't think I'll be able to do that." The Petitioner said that Counsel never asked the State if they would enter the plea agreement with the Petitioner or asked the trial court whether it would grant a continuance. The post-conviction court entered into evidence an April 21, 2012 letter from Counsel referencing the State's offer. The letter indicated the State's offer of a guilty plea as a Range II offender for a fifteen-year sentence. The Petitioner confirmed that he had no notice before trial that he was a Range III offender. He confirmed that, had he known he would be sentenced as a Range III offender, he would have accepted the State's offer.

The Petitioner testified that Counsel did not prepare him for the sentencing hearing. He recalled that Counsel discouraged him from speaking at the sentencing hearing, but the trial judge allowed him to speak. He said that there were no witnesses on his behalf and no mitigating factors presented. The Petitioner stated that Counsel did not file a motion for new trial in a timely manner. The Petitioner said that he filed one himself on October 29, 2012, within thirty days of the judgment. The Petitioner identified Counsel's untimely motion for new trial filed on November 14, 2012. The Petitioner testified that, as a result of Counsel's failure to timely file the motion for new trial, many of the Petitioner's issues were waived on appeal.

The Petitioner testified that he wanted to give the closing argument at trial. Counsel told the trial court and the trial court denied the request. The Petitioner then recounted the following exchange between he and the trial court, the trial court stated, "no; said you have an attorney. I said well, can I fire him? He said you didn't hire him you can't fire him." The Petitioner agreed that this interfered with his right to present his own defense.

The Petitioner testified that, during jury deliberations, the jurors asked about K.M.'s description of the person or persons who touched her. Initially, the trial court suggested that the response be that there was no description. The State, however, disagreed and suggested the response be that the jury "needed to rely on their own recollection." The Petitioner testified that Counsel agreed to that instruction rather than arguing that the jury should be told that there was no description.

- 9 -

The Petitioner testified that his first attorney filed a motion to suppress his statement to the police. The Petitioner alleged that Detective Ewing told him that if he gave an incriminating statement, "he'd give me a bond." His first attorney believed the statement would be suppressed on that basis. By the time of the suppression hearing, however, the Petitioner was unable to pay his attorney so that attorney "dropped off [his] case and sent somebody else over [ ] to handle it." The subsequent attorney "didn't argue or fight for the case." Counsel did not file a renewed motion regarding the suppression motion.

The Petitioner testified about his allegation of prosecutorial misconduct. He said that during opening argument the State said that he "molested" and "fondled" the victim. The Petitioner said that the victim never alleged that someone "rubbed her, touched her, caressed her, there was nothing sexual in nature for it." He said the victim's tattoo was located "way up here by her collarbone." The Petitioner said that Counsel also used the word "fondle" during cross-examination of K.M. During closing argument, the State also referenced testimony from Mr. Brown that he saw one of the suspects go over to K.M. The Petitioner stated that Mr. Brown never testified to that but rather testified that "he couldn't see nothing the entire time."

On cross-examination, the Petitioner agreed that K.M. testified that she saw the Petitioner on two additional occasions after the burglary. The Petitioner agreed that Counsel did cross-examine K.M. about her misidentification of the perpetrators. The Petitioner read a sentence from the State's notice of intent to seek enhanced punishment: "The Defendant is a Career Offender pursuant to Tenn. Code Ann. § 40-35-106." Acknowledging that the statute was incorrect, the State inquired whether the actual wording "Career Offender" made him aware that the State sought sentencing as a career offender. The Petitioner agreed that he had seen the wording but that the trial court had discussed Range II with him, so he believed he would be sentenced accordingly. The Petitioner agreed that in court on the morning of trial the State announced career offender and that he was actually sentenced below that as a persistent offender.

The Petitioner agreed that he argued with Counsel throughout the trial, attempted to have him removed from his case, and wanted to do his own closing argument due to his lack of faith in Counsel's abilities. Given the discord between Counsel and the Petitioner, the State inquired as to why the Petitioner followed Counsel's "advice" about testifying at trial. The Petitioner stated that he did so because he "didn't know nothing about that."

The Petitioner testified that, if given the opportunity, he would have called his wife, sister, brother, Community Corrections officer, and former teachers as "character

- 10 -

witness[es]" at his sentencing hearing.  The Petitioner said that he believed the trial court, in mitigation, should have considered that the Petitioner was in school, he had "family responsibilities, his sister had Lupus, and he was involved in community "fund raisers." The Petitioner stated that he was aware that his offenses had mandatory one hundred percent sentences.  He acknowledged that the trial court did sentence him at a lower range than the career offender the State sought and that he received the minimum sentence in the range for his aggravated sexual battery conviction.

The Petitioner agreed that, other than his concerns about the cross-examination of K.M. and Mr. Brown, he had no complaints about Counsel's examination of the other witnesses at trial.

Counsel testified that he believed that portions of the Community Corrections violation hearing would have been admissible, but had he sought the admission of those portions it may have allowed the State to introduce portions that might have been harmful to the defense.  Counsel said that his trial strategy with respect to the aggravated sexual battery charge was not to challenge whether the act occurred but to argue whether the act constituted aggravated sexual battery under the law.  Counsel stated that he did not believe the Petitioner was the primary actor and felt he successfully conveyed this to the jury based upon their finding of guilt as to facilitation.  He said that he was "shocked" by the aggravated sexual battery conviction because he did not believe the evidence supported it.

Counsel testified that co-defendant Marquan Hudson placed the Petitioner at the scene as did the Petitioner himself when the Petitioner spoke with Detective Ewing.  As to his agreement with reference to the Petitioner's prior convictions, Counsel said he agreed that they were valid convictions, but he did not address whether the Petitioner could be impeached with those convictions.  He stated that, had the Petitioner chosen to testify, the issue of the use of the convictions would have then been addressed.  About a client's right to testify, Counsel said that he typically told clients that there were three areas in which the client must decide how to proceed: (1) whether to plead guilty or proceed to trial, (2) whether to testify; and (3) whether to appeal.  Counsel said that he had "extensive discussions" with the Petitioner about "it" but that the Petitioner never indicated he wanted to testify.  Counsel said the only time he recalled the Petitioner wanting to speak was for closing argument, and the trial court denied the request.

Counsel testified that he spoke with the Petitioner's wife "a couple times" and that she "wanted no part of it."  He said that no family or friends attended the trial on the Petitioner's behalf.  Counsel testified that Counsel's wife bought the Petitioner clothing to wear at trial.  The only name the Petitioner provided to Counsel as a potential witness

was the Petitioner's wife. Counsel said he did not recall any applicable mitigating factors.

Counsel testified that he conveyed the State's offer to the Petitioner and said that he had "multiple conversations" with the Petitioner about the offer. Counsel explained to the Petitioner that the offer had an expiration date as indicated on the offer letter. The trial court also explained the offer to the Petitioner and "urged [him] to strongly consider the State's offer." Counsel said that the State, the trial court, and he all went to "great lengths" to ensure that the Petitioner was aware of the consequences of proceeding to trial. Counsel stated, "There's no doubt in my mind [the Petitioner] knew the risk he was running by going to trial." Counsel stated that the plea offer was no longer available at the time of trial, but that if the Petitioner had asked him to, he would have "at least asked."

Counsel testified that, other than the issue addressed in the suppression motion filed by the Petitioner's first attorney, he did not find any other evidence that could be suppressed. Counsel said that after the trial he filed a "motion for judgment of acquittal based on the agg sex bat." The trial court held a hearing and denied the motion. He said he then filed the motion for new trial, but it was not within the required thirty days. He admitted that the late filing was an oversight on his part.

About the Petitioner's allegation that Counsel mishandled the response to the question asked by the deliberating jury, Counsel testified that the trial court stated that it did not normally comment on the evidence. Counsel said that his experience with that particular trial judge was that the judge preferred that a jury make decisions based upon what was presented. Counsel's recollection of the exchange was that the trial court appeared very reluctant to comment other than to instruct the jury to rely on their memory of the evidence.

On cross-examination, Counsel testified that he did not recall the Petitioner asking him to introduce K.M.'s previous statements, but agreed that the Petitioner asked "a lot of questions during the trial" while Counsel was trying to listen to witnesses or the trial court. Counsel agreed that he did not seek to introduce the prior statements into the record. Counsel stated that he did not use K.M.'s previous statements to impeach her because his trial strategy was not to challenge whether she was touched with a gun or not but whether she was touched with the gun for purposes of sexual gratification. Counsel denied telling the Petitioner "he was not going to testify." He said that he would "never" tell any criminal defendant they could not testify.

Counsel testified that he did not recall whether he met with the Petitioner before the sentencing hearing, but noted that he could not produce anyone to testify on the

Petitioner's behalf. Counsel said that he did not recall the Petitioner, on the morning of trial, stating that he wanted to accept the State's offer. Counsel clarified, however, that if the Petitioner had stated as much, Counsel would have spoken to the State about it. Counsel acknowledged that there had been testimony during the post-conviction hearing about confusion over the Petitioner's range of sentencing. He stated that his recollection was that the Petitioner was a Range III offender. Counsel stated that he did not recall the Petitioner asking for a continuance to determine his range but said that, had the Petitioner done so, he would have asked the trial court for a continuance. Counsel said that he was never under the impression that the Petitioner was only proceeding to trial because he thought he was a Range II offender. He said that, based upon his conversation with the Petitioner, the Petitioner pursued trial because he believed he could "beat it."

Counsel testified that he did not file a motion to suppress the Petitioner's statements to the police because prior counsel had already litigated the suppression issue. Counsel admitted that he failed to timely file a motion for new trial; however, based upon the trial, he believed the only valid issue to be raised on appeal was sufficiency of the evidence, which was preserved.

Counsel testified that the trial court's position with jury questions was to allow the jury to rely on their recollection of the testimony rather than to comment on the evidence. Counsel testified that was the decision made with respect to the jury question during the Petitioner's trial. Counsel said that he did not deny the Petitioner the opportunity to present closing argument at trial. He said he conveyed the Petitioner's request to the trial court, and the trial court denied the request.

After hearing the evidence, the trial court took the matter under advisement and later issued an order denying relief. It is from this judgment that the Petitioner appeals.

## II. Analysis

On appeal, the Petitioner asserts that he received the ineffective assistance of counsel, his convictions are based on illegal evidence presented at trial, and the State committed prosecutorial misconduct during opening and closing statements. The State asks that we affirm the post-conviction court's judgment.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and

value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

## 1. Ineffective Assistance of Counsel

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (*citing Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking

- 14 -

into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### a. Cross-examination

The Petitioner asserts that Counsel failed to impeach K.M. and Mr. Brown at trial with inconsistencies from their police statements and Community Corrections violation hearing testimony. He further asserts that Counsel was deficient for failing to introduce the Community Corrections violation hearing transcript. The State responds that the proof shows that Counsel properly cross-examined the victims about their statements and prior testimony. In its order denying relief, the trial court made the following findings:

> A review of the trial transcript reflects that trial counsel covered many, if not all of the inconsistencies in [K.M.'s] prior statement. Petitioner makes specific reference to testimony which he contends establishes that the victim did not see the petitioner. The transcript of the violation of

- 15 -

Community Corrections hearing reflects that the victim kept her eyes closed "most" of the time. The victim further stated that she "sometimes" saw who was doing various things to her during the robbery. As pointed out by the State, to say that the victim kept her eyes closed the entire time is factually incorrect.

Trial counsel established many inconsistencies, established that the victim did not immediately call the police, and that the victim initially was untruthful with the police. Therefore the court finds that trial counsel afforded proper cross-examination, and that counsel's performance was neither deficient nor prejudicial to the defense.

. . . .

The transcript of the Community Corrections hearing confirmed much of the testimony of the victim, and while there were some inconsistencies, the introduction of the transcript may very well have been detrimental to the cause of the petitioner. Therefore this court does not find the failure to introduce the transcript as being either deficient in the representation of counsel, or prejudicial to the petitioner.

The evidence does not preponderate against the post-conviction court's findings. Counsel testified that he did not seek to enter the revocation hearing transcript into evidence because of the potential for allowing the State to use the transcript to the detriment of the defense. Counsel, however, questioned K.M. at trial about inconsistencies in her statements and testimony. Specifically, he pointed out to K.M. that at trial she testified three men were armed when previously she testified that only two of the men were armed. Counsel elicited responses from K.M. indicating she did not know which suspect carried her belongings out of her residence. Counsel also elicited from K.M. her admission that she was not initially truthful with the police and did not immediately call police after the incident. Likewise, Mr. Brown admitted to making false statements to the police and failing to call the police at all following the robbery. Further, the Petitioner has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Accordingly, the Petitioner has not shown that he is entitled to relief under the *Strickland* standard. In our view, Counsel's cross-examination of both witnesses was reasonable. He stated his reasoning for not introducing the transcripts at the hearing, which was an informed decision. By so doing, he limited the State's ability to emphasize

- 16 -

aspects of the testimony that were contrary to the defense theory. He did, however, cross-examine both witnesses about discrepancies and elicited responses related to their honesty as it related to the offense. Thus, we conclude that the Petitioner has failed to show that Counsel was ineffective in his cross-examination of K.M. and Mr. Brown or that any alleged deficiency prejudiced him. The Petitioner is not entitled to relief as to this issue.

## b. Admissibility of Prior Convictions

The Petitioner asserts that Counsel failed to seek a determination by the trial court regarding the admissibility of the Petitioner's prior convictions. The State responds that the Petitioner has failed to prove deficiency in Counsel's judgment regarding the prior convictions and failed to show that his prior convictions would not have been admitted for impeachment purposes. In the order denying relief, the trial court impliedly accredited Counsel's testimony as follows:

> The testimony of trial counsel at the hearing for post conviction relief reflected that the petitioner made a knowing decision not to testify. Since the petitioner did not testify there was no reason for the trial court to address the question of the admissibility of the petitioner's prior convictions.

At the post-conviction hearing, Counsel testified that the agreement to which the Petitioner referred was Counsel agreeing that the convictions were valid; however, Counsel had not been agreeing that the convictions could be admitted for impeachment purposes. Counsel stated that the Petitioner did not intend to testify but had the Petitioner indicated that he wished to testify at trial, Counsel would have pursued a determination from the trial court as to the admissibility of the Petitioner's prior convictions. Because the Petitioner expressed no interest in testifying, a determination as to the admissibility of the prior convictions was unnecessary. Accordingly, the post-conviction court did not err in denying relief as to this issue.

## c. Right to Testify at Trial

The Petitioner contends that Counsel failed to explain to him his right to testify and instead told the Petitioner he would not be testifying. The State responds that the Petitioner has failed to show that Counsel was deficient in this respect. In its order denying relief, the post-conviction court made the following findings:

> The testimony of trial counsel at the hearing for post conviction relief was that trial counsel discussed at length with the petitioner concerning

petitioner's right to testify. In addition, the trial court reviewed with the petitioner his right to testify, as reflected in the trial transcript. Further, the petitioner executed a written waiver further confirming that he knowingly and voluntarily waived his right to testify.

(citations to the record omitted).

At trial, after the State concluded its case-in-chief, Counsel announced that the Petitioner was not going to testify. The Petitioner executed a waiver of his right to testify, and the trial court questioned him about it. Specifically, the trial court asked the Petitioner if he understood his waiver of the right to testify, and the Petitioner answered in the affirmative. The Petitioner then identified his signature on the waiver. At the post-conviction hearing, Counsel testified that he advised all clients that it was their decision whether to testify. He said that he had "extensive discussions" with the Petitioner about his rights and that the Petitioner never indicated any interest in testifying. Accordingly, the Petitioner has not shown that he is entitled to relief under the *Strickland* standard.

### d. Sentencing Hearing

The Petitioner asserts that Counsel was not prepared for the sentencing hearing because he did not call any witnesses or present evidence of mitigating factors. The State responds that the Petitioner has failed to show any deficiencies because, at the post-conviction hearing, he did not present any of the witnesses he complains Counsel did not call at the sentencing hearing. Further, the State points out that the Petitioner failed to prove how his proposed mitigating factors would have changed the sentence.

We agree that Counsel's failure to present known and available material witnesses at trial may be grounds for post-conviction relief; however, only when the witnesses testify at the post-conviction evidentiary hearing and the testimony's absence from trial "resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As the State correctly notes, the Petitioner has failed to present any of the witnesses that allegedly would have testified on his behalf at sentencing. We cannot speculate as to what the witnesses' testimony might have been. *See Black*, 794 S.W.2d at 757-58. Thus, it is impossible to conclude that the Petitioner was prejudiced.

As to the Petitioner's complaint with respect to mitigating factors, we conclude that the Petitioner has failed to show a deficiency in Counsel's performance. The Petitioner merely asserts that his school attendance, family obligations and involvement in community events were sufficient to mitigate his sentence. The evidence in the record does not preponderate against the post-conviction court's finding that the Petitioner failed

to show by clear and convincing evidence that he was deprived of his constitutional right to effective assistance of counsel. The Petitioner had ten prior felony convictions and was serving a Community Corrections sentence at the time of these offenses. The Petitioner has failed to demonstrate how evidence of any mitigating factors would have had a reasonable probability of changing the outcome of the sentencing hearing. The Petitioner is not entitled to relief as to this issue.

### e. State's Plea Offers

The Petitioner asserts that Counsel was deficient because he did not "pursue a resolution of this case short of trial." He contends that he desired to reach a settlement in this case and Counsel "refused" to convey his interest to the State. The State responds that the Petitioner has failed to prove that Counsel's performance was deficient and prejudicial. As to this issue, the trial court made the following findings:

> Trial counsel testified that he advised the petitioner of the offers from the State, and that the petitioner declined such offers, and indicated that he wanted to proceed with trial. Trial counsel also testified concerning forms signed by the petitioner acknowledging the penalties that he was facing, nevertheless the petitioner decided to proceed to trial.

The evidence does not preponderate against the post-conviction court's findings. An April 21, 2012 letter drafted by Counsel conveying the State's offer to the Petitioner was entered as an exhibit at the post-conviction hearing. The letter conveyed the terms of the agreement and the Petitioner's exposure at trial, warning the Petitioner of the potential for "a significantly longer sentence." At the bottom of the page is the Petitioner's signature acknowledging his receipt of the letter. Consistent with Counsel's testimony that he, the State, and the trial court all attempted to make the Petitioner aware of his significant exposure at trial, was the State's offer letter, outlining the offer and indicating that the offer would expire on August 21, 2012. It was also signed by the Petitioner. Additionally, in the record is a transcript of an August 24, 2012 settlement hearing, reflecting that the trial court addressed the potential punishment the Petitioner could face following a trial. The Petitioner claims he wanted to accept the offer on the morning of trial, August 27, 2012, after its expiration; however, Counsel had no recollection of the Petitioner requesting that Counsel attempt to accept the expired offer. Counsel testified that, as was his practice, if the Petitioner had made such a request, Counsel would have approached the State regardless of the expiration of the offer. Further, the Petitioner has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The Petitioner presented no evidence showing that the State

- 19 -

would have extended its offer beyond the stated expiration. Accordingly, the Petitioner has not shown he is entitled to relief as to this issue.

### f. Pre-trial Motion

The Petitioner asserts that Counsel was deficient because he failed to file a motion to suppress the Petitioner's statement to the police. He contends that he provided the statement based upon the promise of leniency. The State responds that Counsel was not deficient because the Petitioner's first trial counsel filed a suppression motion based upon "promises of leniency and favoritism if he implicated himself in the crimes." *Jackson*, 2014 WL 2039761, at *8. The post-conviction court denied relief, finding that Counsel was not deficient for not filing a suppression motion on an issue already determined. We agree. Counsel is not required to file a second motion raising the same grounds for which the initial motion was denied. The Petitioner is not entitled to relief as to this issue.

### g. Motion for New Trial

The Petitioner asserts that Counsel is ineffective for failing to timely file a motion for a new trial. The State responds that, because the Petitioner failed to prove that he was abandoned on appeal and that the State's case was not subjected to the adversarial process, he cannot establish a finding of presumed prejudice.

The Petitioner filed a *pro se* motion for new trial raising one issue related to jury instructions. Because the Petitioner was represented at the time, his motion was not considered by the trial court. Counsel also filed a motion for new trial; however, it was untimely. Thereafter, Counsel withdrew from representation and a new attorney was appointed. The new attorney filed an amended motion for new trial and the trial court considered it on the merits. On direct appeal, the Petitioner alleged that "the trial court erred in denying his pre-trial motion to suppress; erred in failing to determine whether the [Petitioner]'s prior convictions were admissible; erred in failing to grant a continuance after finding error in the State's notice of intent to seek enhanced punishment; erred in failing to instruct the jury on theft as a lesser-included offense of aggravated robbery; that the evidence was not sufficient to support his conviction of aggravated sexual battery; that the trial court failed to act as thirteenth juror; and that he should not have been sentenced as a Range III offender." This court determined that these issues were waived due to the untimely filing of the motion for new trial but reviewed each of the issue for plain error, finding none.

Here, the Petitioner relies on *Wallace v. State* to support his proposition that trial Counsel's failure to timely file his motion for new trial was ineffective and resulted in his case not being subjected to "the adversarial appellate process." 121 S.W.3d 652, 659

(Tenn. 2003). However, the Petitioner's reliance on *Wallace* is misplaced. Similar to the Petitioner's case, the motion for new trial was untimely filed in *Wallace*. In *Wallace*, however, as a result of the untimely filing, the Petitioner did not receive appellate review of specific issues raised in the motion for new trial regarding alleged errors at trial as to evidentiary issues and comments the trial judge made in front of the jury. In determining whether the petitioner was entitled to post-conviction relief as a result of trial counsel's untimely filing of the motion for new trial, our supreme court held "a petitioner in a post-conviction proceeding must establish that he or she intended to file a motion for new trial and that but for the deficient representation of counsel, a motion for new trial would have been filed raising issues in addition to sufficiency of the evidence." *Id*. Further, the court held, "[a]s a direct result of counsel's ineffective assistance, the defendant was procedurally barred from pursuing issues on appeal, and the State's case was not subjected to adversarial scrutiny upon appeal." *Id*. at 660.

The *Wallace* court's reasoning does not apply here. According to the record, the Petitioner's motion for new trial appears to challenge the trial court's failure to instruct on the lesser-included offense of theft as to the aggravated robbery charge because the evidence did not support the aggravated robbery conviction. Counsel's untimely filed motion challenged the sufficiency of the evidence and sentencing. He testified at the post-conviction hearing that sufficiency was the only issue of merit he identified and this issue was preserved and reviewed on direct appeal. In *Wallace*, our supreme court held that prejudice was presumed under *United States v. Cronic,* 466 U.S. 648 (1984), because "[c]ounsel's abandonment of his client at such a critical stage of the proceedings resulted in the failure to preserve and pursue the available post-trial remedies and the complete failure to subject the State to the adversarial appellate process." 121 S.W.3d at 658. Because trial counsel's deficiency in failing to file a timely motion for new trial still resulted in appellate review for plain error, we will not presume prejudice under *Cronic*. Thus, the Petitioner must show how the untimeliness of the motion prejudiced him, which he failed to do. Instead, the record indicates the Petitioner received direct appellate plain error review of the issues raised in his motion for new trial and was accordingly denied relief, and he is not entitled to post-conviction relief as a result. *See Jackson*, No. M2013-00696-CCA-R3-CD, 2014 WL 2039761 (Tenn. Crim. App., at Nashville, May 16, 2014).

We note that this court was unable to review the issue related to the trial court's failure to instruct on the lesser-included offense of theft because the record was incomplete. This waiver of review, however, cannot be attributed to Counsel, as Counsel had withdrawn before the case was appealed. The Petitioner is not entitled to relief as to this issue.

**h. Continuance**

- 21 -

The Petitioner faults Counsel for failing to seek a continuance following the trial court's determination that the Petitioner would be sentenced as a Range III offender. The Petitioner asserts that, had Counsel sought a continuance, the trial court would have granted the motion and the State would have agreed to settle the case based upon its previous expired offer. The State responds that the Petitioner has failed to show that the trial court would have granted a continuance and that the State would have agreed to the then-expired offer. We agree with the State.

More than one year prior to trial, the State filed a Notice of Enhancement that stated that the Petitioner was a "Career Offender pursuant to Tenn. Code Ann. 40-35-106." The notice listed ten prior felony convictions with attached corresponding judgments. The Petitioner claims that this notice was not valid because, although it clearly states "Career Offender," the notice was confusing because the statute cited is the statute governing Range II, multiple offenders. The State made an offer of settlement in April 2012, and in its formal offer for a settlement with the Defendant, the State also indicates that the Petitioner "is a Career Offender." The Defendant signed the document acknowledging his receipt of the document. On the morning of trial, the Petitioner successfully argued that some of his prior convictions were not applicable. As part of that discussion, the trial court announced that the Petitioner was a Range III, persistent offender, rather than career offender or a Range II, multiple offender. The Petitioner then proceeded to trial. He alleges that he asked Counsel to request a continuance, and Counsel refused. Counsel testified that he did not recall the Petitioner making this request, but had the Petitioner done so, Counsel would have made a motion for a continuance. Counsel stated that, in his opinion, the Petitioner did not proceed to trial on the basis of his sentencing range, but because he thought he could "beat it."

The Petitioner has failed to show that Counsel was deficient for failing to move for a continuance based upon the fact that Petitioner was "entitled to the proper ten (10) day notice." The Petitioner was given proper notice. Furthermore, the Petitioner has failed to show that the trial court would have granted a continuance or that the State would have entered into the expired plea agreement. Therefore, he has not shown that he is entitled to relief under the *Strickland* standard.

### i. Prejudicial Statements to the Jury

The Petitioner asserts that Counsel "prejudiced [the] Petitioner with his statements to the jury in his opening statement and closing argument, which were not constitutionally effective." The Petitioner alleges that in his opening argument, Counsel "gave an admission of guilt" and made prejudicial statements in closing argument. The

State responds that Counsel exercised reasonable judgement during his opening statement and closing argument.

During the State's opening argument, the State told the jury that they would hear Detective Ewing testify that the Petitioner admitted to being in the residence at the time of the robbery but that he stated that he did not have a gun. Counsel's opening argument was as follows: [2]

> [The State] has given you something of an outline of the case, along with a possible interpretation of events that occurred. I want to say a couple of things about that, about what you are going to hear.

> First of all, the people who were the victims of this crime were not truthful to the police. You are going to hear evidence of that. They made misstatements, they made signed - - they gave the police signed statements that weren't true.

> You will hear that [K.M.] did not identify [the Petitioner] in photo lineups. In fact, she misidentified numerous people. Said yeah, that's the guy, that's the guy, that's the guy - - [ ] people that had [nothing] to do with this at all. Mr. Brown lied to the police. You are not going to hear, I don't suspect, I am not sure but I don't think you are going to hear from anybody involved directly either as a victim or an accused, that doesn't have a criminal record. Some of those criminal convictions are crimes of dishonesty and Judge Jones will talk to you about that later when he charges you.

> You will hear that [the Petitioner] admitted to the police that he was there, but here's what you are going to have to figure out. Based on the facts that are presented, there were three people that went into that apartment.

"Cases addressing a defense counsel's admission that his client is guilty generally fall into one of two categories." *Paul Galbreath v. State*, NO. 01C01-9603-CC-00097, 1997 WL 576495, at *2 (Tenn. Crim. App., at Nashville, Sept. 18, 1997). In some cases, defense counsel's admission of his client's culpability is characterized as a "functional guilty plea" and constitutes the ineffective assistance of counsel. *See, e.g., Wiley v.*

---

[2]Several pages appear to be missing from the transcript, including a portion of Counsel's argument. The Petitioner cites to the wrong page in the transcript but it appears that it is this portion of the argument to which he refers.

- 23 -

*Sowders*, 647 F.2d 642, 649-50 (6th Cir.1981). In other cases, however, counsel's admission of his client's culpability has been characterized as a reasonable strategic choice under the circumstances since it leaves open the possibility of the jury finding the defendant guilty of a lesser-included offense. *See, e .g., State v. Caldwell*, 671 S.W.2d 459, 466 (Tenn.1984).

In our view, Counsel did not make an admission of guilt; he acknowledged the State's evidence to be presented at trial. The State outlined the evidence it intended to present at trial, and Counsel responded consistently with his trial strategy of mitigating the Petitioner's role in the charged offenses. Counsel was, to some degree, successful in this strategy as indicated by the jury's verdict of facilitation of some of the charged offenses. Counsel's statements in response to the State's overview of the evidence were a "reasonable strategic choice under the circumstance." *Id.*

The Petitioner asserts that in closing argument Counsel "state[d] that 'the murder of a hit man is still murder,' that 'rape of a prostitute is still rape,' and 'robbery of a drug dealer is still robbery.'" The State responds that these phrases served as a preface to an attack on the credibility of the State's witnesses and that Counsel's statements during closing argument were reasonable. We agree with the State.

The argument to which the Petitioner references is as follows:

You heard from [K.M.], Xavier Brown, [and] Marquan Hudson . . . . To use an illustration, the murder of a hit man is still murder. Rape of a prostitute is still rape. Robbery of a drug dealer is still robbery. Here's the problem. When people are involved in criminal activity, they have a tendency to not tell the truth. Your challenge is to determine what is truth and what wasn't. There were a number of self-serving statements made by people sitting in that chair, people who had a vested interest in wanting you to see certain things. This wasn't an innocent bystander on the street that saw a bank hold up. These people were intimately involved with what happened.

[K.M.] you have as exhibits people she pointed out in the lineups that had absolutely nothing to do with this. I say that to say this, it's clear from the time that she looked at those photos and could not identify [the Petitioner] that she doesn't know in the apartment who did what. Marquan Hudson, [the Petitioner], and Demetrius Ford, those three people were in the apartment and I told you when this trial began you got to figure who did what? She couldn't even tell us who touched her, if you recall that[.] She

- 24 -

didn't report this crime to the police.   Her sister overheard her telling her
father about it and her sister called the police.

Counsel then went on to challenge Mr. Brown's "false statements to the police."  He
highlighted that Mr. Hudson pleaded guilty to robbery of the cell phone and that the
evidence indicated that Mr. Hudson had the cell phone, but, at the Petitioner's trial, Mr.
Hudson denied taking the cell phone.

Counsel's statements in closing are consistent with the defense strategy to mitigate
the Petitioner's involvement in the offenses.  As Counsel testified at the hearing, the co-
defendant and the Petitioner placed the Petitioner in the apartment, thus precluding a
valid argument of total innocence.  In light of the evidence against the Petitioner,
Counsel's strategy was reasonable and his statements in closing argument were consistent
with the strategy.  The Petitioner is not entitled to relief as to this issue.

### j. Closing Argument

The Petitioner contends that Counsel was deficient because he "failed to allow
Petitioner to present his own closing argument."  The State responds that because the trial
court denied the Petitioner's request, he cannot show that Counsel was deficient.  We
agree with the State.

Our supreme court has long recognized that closing argument is a valuable
privilege for both the State and the defense and have allowed wide latitude to counsel in
arguing their cases to the jury.  *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1994).
Trial judges in turn are accorded wide discretion in their control of those arguments, *State
v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995), and this discretion will not be
interfered with on appeal in the absence of abuse thereof.  *Smith v. State*, 527 S.W.2d
737, 739 (Tenn. 1975).

The Petitioner asserts that Counsel is at fault for not allowing him to present
closing argument; however, it was not Counsel's prerogative to decide whether the
Petitioner was to address the jury in closing.  After closing arguments, Counsel made the
trial court aware that the Petitioner wanted to address the jury.  The Petitioner explained
his position to the trial court and, ultimately, the trial court denied the Petitioner's request
finding that the Petitioner was represented by Counsel who provided the closing
argument.  We discern no deficiency on Counsel's part with respect to this complaint.
The Petitioner made Counsel aware of his desire to address the jury and Counsel relayed
that request to the trial court who denied the request.  The Petitioner is not entitled to
relief as to this issue.

## k. Supplemental Instruction to the Jury

The Petitioner asserts that Counsel agreed to jury instructions that were to the detriment of the Petitioner. The State responds that Counsel's decision regarding the supplemental instruction to the jury in response to a jury question was reasonable.

"The trial court has the authority to respond to jury questions with a supplemental instruction." *State v. Forbes*, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995) (citing *State v. Moore*, 751 S.W.2d 464, 467 (Tenn. Crim. App. 1988)). When a trial court repeats instructions or gives supplemental instructions, the instructions must be:

> (1) appropriately indicated by questions or statements from jurors, or from the circumstances surrounding the deliberative and decisional process, (2) comprehensively fair to all parties, and (3) not unduly emphatic upon certain portions of the law to the exclusion of other parts equally applicable to the area of jury misunderstanding or confusion.

*Berry v. Conover*, 673 S.W.2d 541, 545 (Tenn. Ct. App. 1984). "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" *State v. Majors*, 318 S.W.3d 850, 864-65 (Tenn. 2010) (quoting *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)); *see State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *Forbes*, 918 S.W.2d at 447; *Graham v. State*, 547 S.W.2d 531, 544 (Tenn. 1977)).

The record reflects that the jury submitted the question, "Did Brown testify to seeing the perpetrator of the assault?" and the trial court responded, "That's a question of fact that I cannot answer for you." The foreperson clarified that the jury had recollections about Mr. Brown's testimony and wanted to rehear a portion of the audio recording of Mr. Brown's testimony. During a recess, both attorneys and the trial judge reviewed the recordings and agreed Mr. Brown did not identify the person touching K.M. The trial court stated, "Normally, I would not comment on the evidence whatsoever, but it would seem to be better just to tell the jury that Mr. Brown did not provide any testimony." The State suggested that the trial court advise the jury to "rely on your own recollection" rather than speaking to the testimony, explaining that the concern was that the jury would simply adopt the position that there was no description when "some of them obviously think there was." The trial court then called in the jury and stated, in relevant part, "The answer is . . . without my commenting on the evidence, you must rely on your own memory as to what a witness did or did not say."

The Petitioner claims that Counsel should have objected to this instruction, however, the Petitioner fails to show that the supplemental instruction was objectionable. The instruction was in response to a question asked by the jurors. The instruction was fair to both parties in that it did not preclude jurors who recalled a description from relying on that testimony, and did not cause misunderstanding or confusion. The instruction was a fair statement of the law in that judges are prohibited from commenting upon the evidence in a case. *State v. Hester*, 324 S.W.3d 1, 89 (Tenn. 2010). Furthermore, the Petitioner provided no evidence that, upon Counsel's objection, the trial court would have instructed the jury that there was no description. Accordingly, the Defendant has failed to show that Counsel was deficient in this respect and that this alleged deficiency caused prejudice. He is not entitled to relief as to this issue.

### l. Breakdown of the Adversarial System

The Petitioner claims that, although he has demonstrated prejudice in each of the above discussed issues, he need not do so. He claims, citing *United States v. Cronic*, 466 U.S.648, 659 (1984), that Counsel "failed entirely to subject the prosecution to meaningful adversarial testing" such that he was denied his right to Sixth Amendment protections. The Petitioner makes no specific claims of deficiencies under this issue, so we presume that he relies upon his prior issues in support of this argument.

As we have already stated, the Petitioner has failed to establish any prejudice to his case as a result of the actions or inactions of Counsel. The Petitioner claims that the failures of Counsel should be considered "per se" prejudicial. A reviewing court will presume prejudice to an accused's right to counsel only when there has been the complete deprivation of counsel at a critical stage of the proceedings, a complete failure to subject the State's case to adversarial testing, or under circumstances of such magnitude that no attorney could provide effective assistance. *Id.* at 659-60. Although the Petitioner claims that prejudice should be presumed because Counsel "failed entirely to subject the prosecution to meaningful adversarial testing," the record establishes that the State's case was indeed subjected to adversarial testing at his trial, the primary arena of true adversarial testing in our system of justice. *See Cronic*, 466 U.S. at 656 ("When a true adversarial criminal trial has been conducted - even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred." (footnote omitted)).

The Supreme Court, in *Bell v. Cone*, specifically limited *Cronic* to those situations where counsel's "failure to test the prosecutor's case" was "complete." 535 U.S. 685, 696-97 (2002). In *Cone*, the Court characterized the petitioner's argument as "not that his counsel failed to oppose the prosecution throughout the . . . proceeding as a whole, but that his counsel failed to do so at specific points" and concluded that such an

argument should be assessed under the rule of *Strickland* rather than that of *Cronic*. *Id*. at 697. As such, the standard announced in *Strickland* rather than that announced in *Cronic* is the appropriate one for review of the Petitioner's claims in this case. Consequently, the Petitioner must establish prejudice resulting from his Counsel's deficient performance. *Cronic*, 466 U.S. at 658 ("Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated."). As a result, the Petitioner is not entitled to relief on this issue.

## 2. Use of Illegal Evidence

The Petitioner asserts that his conviction is based upon illegal evidence and therefore cannot stand. He essentially raises the arguments made in his suppression motion as a basis for this challenge. The State responds that this issue is waived because it was "previously determined." We agree with the State. Post-conviction is not to be used to relitigate decided legal questions. *See* T.C.A. § 40-30-106 (2014); *See also, Gant v. State*, 507 S.W.2d 133, 135 (Tenn. Crim. App. 1973). The Petitioner is not entitled to relief as to this issue.

## 3. Prosecutorial Misconduct

The Petitioner complains that prosecutorial misconduct occurring during opening and closing argument requires reversal. Specifically, he complains that the State made untrue statements and misconstrued trial testimony during argument to the jury. The State responds that the Petitioner's issue is waived because he failed to raise the issue on direct appeal.

We agree that this claim has been waived. The post-conviction statute defines waiver:

> A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
>
> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

T.C.A. § 40-30-106(g). This claim of prosecutorial misconduct was available on direct appeal and neither of the exceptions apply. The Petitioner is not entitled to relief as to this issue.

## III. Conclusion

Based on the foregoing authorities and reasoning, we affirm the post-conviction court's denial of post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE